# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 29, 2014

## STATE OF TENNESSEE v. ROHMAN M. HARPER

**Appeal from the Circuit Court for Cheatham County**
**No. 16363     George C. Sexton, Judge**

---

**No.  M2014-00944-CCA-R3-CD - Filed December 9, 2014**

---

The Defendant, Rohman M. Harper, was found guilty by a Cheatham County Circuit Court jury of aggravated sexual battery, a Class B felony.  *See* T.C.A. § 39-13-504 (2014).  Before the trial, the Defendant pleaded guilty to resisting arrest, a Class B misdemeanor, and to public intoxication, a Class C misdemeanor.  *See id*. §§ 39-16-602 (2014), 39-17-310 (2014). The trial court sentenced the Defendant to concurrent terms of eight years at 100% service for aggravated sexual battery, six months for resisting arrest, and thirty days for public intoxication.  On appeal, he contends that the evidence is insufficient to support his aggravated sexual battery conviction.  Although we affirm the aggravated sexual battery conviction, we remand the case for entry of corrected judgments relative to the resisting arrest and public intoxication convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Vacated in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Gregory D. Smith (at motion for new trial and on appeal), Clarksville, Tennessee, and Michael J. Flanagan (at trial), Nashville, Tennessee, for the appellant, Rohman M. Harper.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Dan M. Alsobrooks, District Attorney General; and Robert S. Wilson, Deputy District Attorney General, for the appellee, State of Tennessee.

# OPINION

At the trial, the then-eight-year-old victim testified that on April 14, 2011, he was age six and that he was at James Tindall's house. The Defendant lived in the basement of the Tindall home, and the victim lived across the street. The victim said that around sunset he was on a tricycle at the front step leading to the Tindall driveway and that while he was sitting on the tricycle, the Defendant "got in front of [him] and reached down [his] pants" with his hands. He said the Defendant touched his skin below his underwear. He called the area his "bad spot," which he identified by circling the penis on an anatomical drawing of the male human body.

The victim testified that he told the Defendant to stop touching him and yelled for Mr. Tindall. The Defendant told the victim not to tell anyone about the touching. He said that Mr. Tindall saw the Defendant's touching him and that the Defendant stopped when Mr. Tindall arrived. The victim ran home to tell his thirteen-year-old brother what had occurred, and the Defendant ran to a nearby tree. The victim did not know how long the touching lasted.

The victim testified that his brother ran after the Defendant, that his brother and the Defendant struggled, and that the Defendant ran away. The victim's parents arrived soon after the incident, and the victim told his parents about the Defendant's touching him.

On cross-examination, the victim testified that he talked to a woman named Laura about the incident, although he did not recall much about their conversation. He did not recall telling her that he was sitting on the tricycle by the deck. He recalled telling her that the Defendant first lifted him off the tricycle and said he remembered it after counsel asked about it. He did not recall telling her that the Defendant also touched his arm and stomach and said he did not think the Defendant touched him there. The victim said he did not remember if he was in front of the door or by the deck.

On redirect examination, the victim testified that he told Laura that the Defendant touched him on his bad spot. He did not recall telling her that the Defendant touched his face but agreed he consistently stated that the Defendant touched his bad spot.

James Tindall testified that several people lived at his house at the time of the incident, including his wife, their children, Mr. Tindall's mother, and the Defendant. He said that at the time of the incident, he was in the kitchen and that the kitchen door led outside where the victim was on his tricycle. He said the Defendant used the restroom and entered the kitchen. He said the Defendant commented on "what he would like to do to" Mr. Tindall's teenage daughter's friend, who was about fourteen years old. Mr. Tindall asked

the Defendant what was wrong with him. Mr. Tindall said that the Defendant was not "normal" that day and that he smelled of alcohol. The Defendant went outside and sat on the steps where the victim was on his tricycle.

Mr. Tindall testified that he heard the victim say, "[L]eave me alone, stop," and that the victim asked for his help. He thought the Defendant was simply "picking" and "messing around" with the victim. Mr. Tindall told the Defendant to leave the victim alone without looking at the victim and the Defendant. Mr. Tindall said he turned around and saw the victim with a "funny look on his face." Mr. Tindall could not see what the Defendant was doing because of the manner in which the Defendant was sitting on the steps, but he thought something "weird" was happening. Mr. Tindall found his wife and told her that he thought the Defendant might have been doing something improper to the victim. He said that his wife walked up behind the Defendant, stood over the Defendant's shoulders, and saw the Defendant with his hand down the victim's pants.

Mr. Tindall testified that the victim saw his wife and ran from the Defendant. Mr. Tindall saw the Defendant grab the victim's arm and heard the Defendant tell the victim, "[Y]ou keep that between me and you, you understand." The victim ran to the rear of the car in the driveway, and the Defendant chased the victim. The victim was able to run across the street. Mr. Tindall said the Defendant was standing next to a big tree when the victim's brother walked to where the Defendant was standing. The victim's brother was angry and attempted to hit the Defendant with a rock, but the Defendant grabbed the victim's brother by the throat and pushed him down. The Defendant attempted to run inside the house, but Mr. Tindall and his wife gathered their children and their children's friends inside and slammed the door on the Defendant's hand. Mr. Tindall saw the Defendant run around the house before the police arrived. The police found the Defendant in the backyard hiding in the leaves. Mr. Tindall said the Defendant had to be restrained after being placed in the rear of the police car. He said that he had known the Defendant for a long time and that he thought the Defendant was under the influence.

Mr. Tindall testified that he did not want to believe what he saw and had his wife look to confirm his observations. He said the incident made him wonder if the Defendant had touched his grandchild, who liked for the Defendant to perform his "Elmo" imitation.

On cross-examination, Mr. Tindall testified that he had a stroke a few months before the incident but that it did not affect his memory or his ability to observe. When presented with the statement he wrote for the police, he agreed he did not mention the look on the victim's face and the Defendant's "not being normal" that day but said he knew what he saw. He agreed his testimony contained more detail than his written statement and said there was a lot of commotion when he wrote his statement. He said that about twenty children were

at his house at the time and that the police officers were dealing with the Defendant, who was kicking and screaming inside the police car. He said that although his written statement did not mention the Defendant's telling the victim to keep the incident between them, he told the police officer about what the Defendant said. On redirect examination, he stated that he was about eight feet from the Defendant when the Defendant told the victim to keep the incident between them.

Krista Crutchfield, Mr. Tindall's wife, testified that she arrived home from work around 5:30 or 6:00 p.m. on the day of the incident and that she lay down in bed for awhile. Mr. Tindall entered their bedroom and told her that he thought the Defendant was doing something to the victim. She walked to where the Defendant was located, looked over his shoulders, and saw that one of the Defendant's hands was down the front of the victim's pants and that the Defendant's other hand was down the back of the victim's pants. She said the victim "just looked" at her and begged for the Defendant to stop.

Ms. Crutchfield testified that the Defendant was sitting on the steps at the backdoor and that the victim was sitting on a tricycle. She said she yelled the Defendant's name, and the victim then ran to a car in the driveway. She said the Defendant ran after the victim, grabbed the victim, and said something to the victim, although she could not hear what was said. The victim ran away across the street. She said that by the time the victim ran away, the Defendant was standing next to a big cedar tree.

Ms. Crutchfield testified that the victim's brother walked across the street to where the Defendant was standing and asked what he did to the victim. She saw the Defendant grab the victim's brother by the throat. The Defendant released the victim's brother when he saw the victim's parents walking toward the house. She said the Defendant attempted to run inside the house, but she slammed the door. The Defendant's hand was caught in the door. She gathered the children inside the house, and the Defendant ran and hid by covering himself with leaves. A police dog found the Defendant.

Ms. Crutchfield testified that the Defendant was placed inside a police car and that he was angry, kicking the car windows, and spitting. The police officers restrained the Defendant. She agreed her testimony contained more detail than her police statement and said she was attempting to gather about ten children at the time she wrote her statement. She noted the commotion created by the Defendant and said she wrote as little as she could in her statement.

On cross-examination, Ms. Crutchfield testified that her written statement did not include Mr. Tindall's entering their bedroom and said that she could not include every detail in the statement, although she agreed it was important information. On redirect examination,

-4-

she stated that the most important information was that she saw the Defendant's touching the victim and agreed that information was contained in her statement. On recross-examination, she stated that she and her husband probably discussed the incident.

The victim's brother testified that he was twelve years old at the time of the incident and that he was home playing with a friend. He and the victim lived across the street from Mr. Tindall and Ms. Crutchfield. He said that the victim, who was terrified, ran inside and told him the Defendant touched him. The victim's brother walked up the Tindall driveway and saw the Defendant standing behind a tree. He said that the Defendant acted unusual and that he asked the Defendant why he touched the victim. The Defendant grabbed the victim's brother's neck, but he was able to free himself. The victim's brother continued to ask why he touched the victim, and the Defendant denied any wrongdoing. The victim's brother told the Defendant that the victim would not lie. The Defendant ran toward the house. He admitted to throwing a rock at the Defendant, who ran around the house. He picked up the rock when he was walking toward the Tindall home. He said the Defendant seemed like he had been "drinking or something."

On cross-examination, the victim's brother testified that the victim did not tell him initially where the Defendant touched him. On redirect examination, he said the victim later told him that the Defendant grabbed the victim in his bad spot. On recross-examination, he stated that the victim said the Defendant touched him in his bad spot the following day, which was before the victim's brother talked to the detective. He agreed he did not mention the bad spot to the detective.

Ashland City Police Officer Jeremy Ethridge testified that on April 14, 2011, he responded to the scene and first spoke with the victim's mother, who told him that the Defendant touched the victim. The victim told Officer Ethridge that he was riding the tricycle in the driveway at the Tindall home, that the Defendant asked him to sit on his lap, that the victim refused, that the Defendant walked to the victim, that the Defendant rubbed the victim's head, face, and neck, and that the Defendant put his hands in the victim's pants and rubbed the victim's "private area."

Officer Ethridge testified that Ms. Crutchfield told him that she saw the Defendant's hand down the victim's pants and that the Defendant ran away. A police dog found the Defendant, and he was placed in a police car. Officer Ethridge was inside the house when the Defendant began kicking the car windows. He went to assist the other officers, but the Defendant was restrained by the time he got there. He said the Defendant had a strong odor of alcohol, glassy eyes, slurred speech, and difficulty standing. He said the Defendant admitted to drinking "a couple" beers, although he did not know how many that actually meant.

On cross-examination, Officer Ethridge testified that he obtained a statement from Ms. Crutchfield and that he recalled her stating that she saw the Defendant's hands down the victim's pants. He also spoke with Mr. Tindall but did not recall the substance of the statement. On redirect examination, he agreed that the victim's birthday was in August 2004.

The Defendant testified that at the time of the incident, he rented a room at the Tindall home but only stayed there on weeknights. On the day of the incident, he arrived home around 5:45 p.m. after obtaining a fifth of whiskey and a few movies to watch. He said he drank at least one-half of the bottle. He said that at some point, he left his bedroom and walked to the bathroom. The door was unlocked, and he walked in on Ms. Crutchfield, who was nearly naked. Ms. Crutchfield screamed, and he closed the door. He walked outside through the kitchen door and relieved himself on a bush, which he said was the household protocol for the men when the downstairs bathroom was occupied.

The Defendant testified that he pleaded guilty to public intoxication because he was intoxicated on the day of the incident. He denied recalling any of the events to which the previous witnesses testified. He said that before he finished urinating on the bush, he heard Mr. Tindall and Ms. Crutchfield yelling for the children to come inside. He said he attempted to enter the house, but Mr. Tindall and Ms. Crutchfield would not allow him inside. He said that he did not understand why they would not allow him to enter and that they told him they were going to call the police. He said he did not know what to do and did not have his cell phone. He said he walked about thirty feet from the house, lay down in the leaves, and "passed out."

The Defendant testified that he awoke to someone shining a flashlight in his face, telling him to get up, and spraying him with pepper spray. He realized he was being arrested when he noticed he was in handcuffs, and he said the police officers dragged him to the police car. He denied kicking the car windows but said he moved the handcuffs.

The Defendant testified that he gave a statement to the police and that he consented to the officers' taking his computer for examination. The police returned his cell phone about one week later. When asked about the trial witnesses' testimony relative to the Defendant's conduct on the day of the incident, he said, "I don't remember that taking place." When asked if it was possible he could have done what was alleged but simply could not remember, he said, "It's a possibility but I wouldn't believe it." He said, though, that was something he did not think he would do. He denied being sexually attracted to juveniles.

On cross-examination, the Defendant testified that he "blacked out" after the door was closed on him but that he could not explain how he did not recall whether he touched the victim given it occurred before the door was closed. When asked about Mr. Tindall's

testimony regarding the fourteen-year-old girl, the Defendant denied commenting on "what he wanted to do" to her.

On redirect examination, the Defendant testified that he was not attempting to mislead the jury. He denied doing anything to anyone for his sexual gratification. On recross-examination, he stated that he did not know of any reason someone would put their hands down a six-year-old boy's pants unless it was for sexual gratification. He agreed his previous testimony was that it was possible he placed his hand down the victim's pants.

Upon this evidence, the Defendant was convicted of aggravated sexual battery. The trial court sentenced him to eight years at 100% service. This appeal followed.

The Defendant contends that the evidence is insufficient to support his conviction for aggravated sexual battery. He argues that the State failed to prove that he acted with the intent or purpose of sexual gratification  The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)*; see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn 2009)).

Aggravated sexual battery is defined, in relevant part, as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when] the victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4) (2014). Sexual contact, in relevant part, is "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal

or gratification.  *Id*. § 39-13-501(6) (2010) (amended 2013).  Intimate parts are "the primary genital area, groin, inner thigh, buttock or breast of a human being."  *Id*. at (2).

The Defendant does not dispute that the State proved beyond a reasonable doubt that the victim was less than thirteen years old at the time of the incident, that the Defendant "touched [the victim's] penis and/or put his hand down [the victim's] pants," and that the contact was unlawful because the victim did not "approve" of it.  He claims, though, that no evidence supports a finding that the contact was intentional for the purpose of sexual gratification.  We disagree and conclude sufficient circumstantial evidence existed showing the Defendant's intent for sexual gratification.

The evidence shows that the Defendant told the victim not to tell anyone about the touching, ran from the house, hid in the surrounding leaves, and was found with the aid of a police dog.  The Defendant testified that it was possible he touched the victim and that he did not know of any reason someone would put their hands down a six-year-old boy's pants unless it was for sexual gratification.  The jury clearly credited the testimony of the victim, Mr. Tindall, and Ms. Crutchfield that the Defendant placed his hand down the victim's pants and touched his penis.  Based on this evidence and the Defendant's admission that sexual gratification would have been the intended purpose of touching a six-year-old boy's private parts, the jury was free to reasonably construe the Defendant's touching the victim was for the purpose of sexual gratification.  He is not entitled to relief on this basis.

We note that the Defendant was also convicted of resisting arrest and public intoxication, although those convictions are not the subject of the present appeal.  The trial transcript shows that the Defendant pleaded guilty to resisting arrest and to public intoxication before the trial began.  The respective judgments, however, reflect that the Defendant was found guilty by a jury.  We also note that each of the respective judgments reflect a sentence of eleven months, twenty-nine days.  The sentencing hearing transcript shows that the trial court sentenced the Defendant to concurrent terms of six months for resisting arrest and thirty days for public intoxication.  As a result, we remand the case for entry of corrected judgments reflecting the Defendant's guilty pleas and the respective sentences imposed by the court.

In consideration of the foregoing and the record as a whole, we affirm the aggravated sexual battery conviction, but we remand the case for entry of corrected judgments relative to the resisting arrest and public intoxication convictions.

_____
ROBERT H. MONTGOMERY, JR., JUDGE